IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
MAY 17, 2005 Session

## DONALD GREG HOPPER v. BETTY J. MOLING

**Direct Appeal from the Chancery Court for Madison County**
**No. 55911     James F. Butler, Chancellor**

_____

**No. W2004-02410-COA-R3-CV - Filed August 26, 2005**

_____

The plaintiff, an unlicensed home improvement contractor, entered into an agreement with the defendant/homeowner to make certain improvements to her existing home. Shortly after the plaintiff left the job site, the defendant/homeowner began to experience several problems associated with the plaintiff's work. The defendant/homeowner paid to have the defects repaired and/or completed. The plaintiff filed a petition against the defendant/homeowner to enforce a materialman's lien. The defendant/homeowner filed a counter-complaint seeking damages for breach of contract, breach of implied warranties, fraud, and violations of the Tennessee Consumer Protection Act. At the conclusion of the bench trial, the chancellor held that the plaintiff's conduct amounted to constructive fraud, thereby voiding the contract; the plaintiff was only entitled to recover the cost of his labor and materials under quantum meruit; and the defendant/homeowner was entitled to damages, attorney's fees, and discretionary costs. The plaintiff appealed to this Court to contest the chancellor's inclusion of certain costs in the damage award, the limitation of his quantum meruit recovery, the finding of constructive fraud, and the award of attorney's fees to the defendant/homeowner. The defendant/homeowner appealed the chancellor's exclusion of certain costs from the damage award and the method used by the chancellor in calculating the damages. We affirm in part and vacate in part.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Vacated in Part**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Kevin Carter, Lexington, TN, for Appellant

J. Brandon McWherter, Jackson, TN, for Appellee

# OPINION

## I.
### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 1998, Betty J. Moling ("Ms. Moling" or "Appellee") entered into an oral contract with Donald G. Hopper ("Mr. Hopper" or "Appellant") whereby Mr. Hopper agreed to make certain improvements to Ms. Moling's home located in Jackson, Madison County, Tennessee. Ms. Moling is an elderly female, and she is the aunt of Mr. Hopper's wife's mother. Mr. Hopper is employed as a trooper with the Tennessee Highway Patrol. Mr. Hopper has also performed construction work for approximately ten years. He previously performed construction work for Ms. Moling prior to engaging in the projects which gave rise to the instant litigation.

Regarding the projects which are the center of this dispute, Ms.Moling asked Mr. Hopper to make two improvements to her home. First, Ms. Moling asked Mr. Hopper to install vinyl flooring in a significant portion of her home. Mr. Hopper agreed to perform this task for $2,600.00 , which represented the cost of his labor and materials. Second, Ms. Moling asked Mr. Hopper to construct a garage/bathroom addition onto her existing home. Mr. Hopper agreed to perform this task for $19,800.00, which represented the cost of his labor and materials. Thus, the total agreed upon cost of both projects equaled $22,400.00.

During the process of entering into the agreement with Ms.Moling, Mr. Hopper admitted that he held himself out as a person who was qualified and competent to perform the requested work. Ms. Moling believed that Mr. Hopper held the proper licenses and had obtained the proper permits necessary for the work she requested him to perform. In fact, Mr. Hopper did not have a contractor's license, an electrician's license, or a plumber's license. Mr. Hopper obtained a building permit on January 15, 1999, after he began constructing the garage/bathroom addition, but he only obtained a permit for $4,000.00.

Mr. Hopper completed the installation of the vinyl flooring on December 9, 1998, and Ms. Moling paid Mr. Hopper the $2,600.00 agreed upon by the parties. According to Ms. Moling, Mr. Hopper assured her that the garage/bathroom addition would be completed by Christmas of 1998, which Mr. Hopper denied. Mr. Hopper began constructing the garage/bathroom addition on January 15, 1999. Ms. Moling paid Mr. Hopper $5,000.00 on January 15, 1999, $5,000.00 on January 28, 1999, and $5,000.00 on February 9, 1999. These payments, totaling $15,000.00, were the only payments Ms. Moling made to Mr. Hopper for the garage/bathroom addition. According to Ms. Moling, each time she gave Mr. Hopper a $5,000.00 payment, he would assure her that the garage would be completed in three to four days. Ms. Moling asserted that, when she gave Mr. Hopper the final $5,000.00 payment on February 9, 1999, he told her that his laborers quit, and he promised that the garage/bathroom addition would be completed in three to four more days. According to Mr. Hopper, the weather in January and February of 1999 delayed construction of the addition. There was a dispute between the parties as to whether Mr. Hopper abandoned the construction project or

was fired after he received the final $5,000.00 payment on February 9, 1999. Mr. Hopper asserted that Ms. Moling fired him. Ms. Moling asserted that Mr. Hopper failed to return to complete the job after she made the last payment.

During the installation of the vinyl flooring, Ms. Moling asserted that she pointed out several problems to Mr. Hopper regarding the quality of his work, and he agreed to fix the problems. She also expressed her dissatisfaction with the installation when she tendered the $2,600.00 payment to Mr. Hopper on December 9, 1998. Mr. Hopper stated that the floor was "good" when he finished the installation, and he believed that Ms. Moling was satisfied with his work up to that point. However, within three months after Mr. Hopper completed the installation, the vinyl flooring began to "peel up." Because she lacked the funds needed to repair the floor at that time, Ms. Moling placed rugs over the floor to cover those areas where the vinyl flooring was "peeling up." Just prior to the trial in this matter, Ms. Moling hired Tim Roe ("Mr. Roe") of T & L Tile Center to repair the flooring. Mr. Roe removed the vinyl flooring and installed a new vinyl floor of the same model installed by Mr. Hopper. Ms. Moling paid Mr. Roe $3,187.00 to repair the flooring.

Ms. Moling also experienced numerous problems with the new garage/bathroom addition constructed by Mr. Hopper. At some point after February 9, 1999, the last time that Mr. Hopper was at the job site, Ms. Moling began to experience electrical problems, and "the breakers kept kicking out all over the house." Ms. Moling contacted Rodney Owens ("Mr. Owens"), a licensed electrician, to inspect her home and determine the cause of the problem. Mr. Owens inspected the home on or around February 15, 1999, and he discovered that Mr. Hopper had improperly installed the electrical wiring for the new garage/bathroom addition. Mr. Owens opined that Mr. Hopper's electrical work was "not too good." Mr. Owens, assisted by Charles Roe ("Mr. Roe"), Ms. Moling's son, pulled off some of the walls erected by Mr. Hopper and noted problems with the plumbing as well. According to Mr. Hopper, he had only completed the "rough wiring" and "rough plumbing" when he left the job site, and he planned to have a friend, who is licensed electrician, finish the electrical and plumbing work.

Mr. Owens instructed Ms. Moling to contact Richard Woodard ("Mr. Woodard"), the building inspector for Madison County at the time, to inspect the garage/bathroom addition. In fact, Mr. Woodard inspected the progress of the construction project on three separate occasions: January 19, 1999, February 19, 1999, and February 24, 1999. During his inspections, Mr. Woodard noted several problems with the construction, and he drafted a letter to Mr. Hopper on February 25, 1999, setting forth his findings. Specifically, Mr. Woodard noted numerous code violations to include the following: (1) failure to obtain a permit for the correct amount of work to be done; (2) failure to obtain a permit to build a bathroom; (3) failure to request a framing or insulation inspection before covering the framing and insulation: (4) failure to square the slab forms before pouring concrete, which allowed water to run under the bottom plate and into the garage; (5) the bottom plate of the walls were improperly anchored; (6) excessive notches were cut in several studs when cutting them for the plumbing drain; (7) insulation was installed on the wrong side of the water supply lines; (8) the water heater was installed so that access to the heating element faces a wall which makes it inaccessible for service; (9) several plumbing leaks have been noted; (10) the shower drain was

improperly vented; (11) the new front door was installed in the existing door jam and did not fit, allowing a 1/4 inch gap on the hinge side; (12) the vinyl floor was installed incorrectly, leaving a gap between blocks in two or more areas; and (13) the electrical work was not inspected by the state electrical inspector. Mr. Woodard characterized Mr. Hopper's work as "not up to standard" and "the workmanship was poor."

In late February of 1999, Ms. Moling hired Chris Stephenson ("Mr. Stephenson"), her granddaughter's husband, to inspect and complete the plumbing work begun by Mr. Hopper. Mr. Stephenson, a licensed plumber at the time, noted that Mr. Hopper had "roughed in the plumbing," but he had not hooked the plumbing up to the water supply. With the assistance of Mr. Roe, Mr. Stephenson hooked the plumbing to the water supply, turned it on, and found that the plumbing installed by Mr. Hopper leaked. Mr. Stephenson also found that a lack of proper ventilation caused the smell of sewage from the septic tank to enter the bathroom, and he noted several plumbing code violations. Ms. Moling paid Mr. Stephenson to repair the plumbing problems, remove rock, and fix ruts left in her yard by Mr. Hopper.

Ms. Moling also experienced numerous leaks around the garage/bathroom addition whenever it would rain. Since the concrete slab the garage/bathroom addition sat on was not square, ground water entered the structure when it rained. Mr. Hopper admitted that the concrete foundation was not square because a retaining brace broke when the concrete was being poured. He stated that, if he would have been allowed to finish the job, he intended to build an asphalt walkway against a wall of the addition to divert rainwater away from the structure. Ms. Moling initially had Will Taylor ("Mr. Taylor") pour concrete around the garage/bathroom addition to prevent leaking. When this failed to remedy the problem, she hired a company to install gutters and an awning on the addition to divert rainwater away from her home. Both parties conceded that their original contract did not call for the installation of the awning. Ms. Moling also paid to have the roof repaired where Mr. Hopper attached the garage/bathroom addition to her existing home because leaks formed in the area when it rained.

On March 18, 1999, Mr. Hopper filed a "Petition to Enforce Materialmans Lien" against Ms. Moling in the Chancery Court of Madison County seeking to recover $5,575.00 for the underpayment of the services he rendered to Ms. Moling. Thereafter, Ms. Moling filed an answer and counterclaim against Mr. Hopper alleging fraud, misrepresentation, and deceit. After the chancellor granted Ms. Moling's motion to amend her counterclaim, she alleged breach of contract, breach of implied warranties, fraud, and violations of the Tennessee Consumer Protection Act. Mr. Hopper filed an answer denying the allegations in Ms. Moling's counter-complaint. Prior to trial, the parties stipulated in writing that Ms. Moling incurred expenses in the amount of $13,546.54 to repair and/or complete the work performed by Mr. Hopper. In the same document, the parties also stipulated that Mr. Hopper incurred $12,255.04 in costs representing his labor and the materials in performing the work on Ms. Moling's residence.

The chancellor conducted a bench trial on March 1, 2004. At trial, Ms. Moling testified that, due to the leaks in the roof, she had to replace the carpet in her bedroom and bathroom in 2001 at

a cost of $224.14. At the conclusion of the hearing, the chancellor orally ruled in favor of Ms. Moling, stating as follows:

> Mr. Hopper, the Court finds that he has breached his duty to do the work in a workmanlike manner and free from structural defects. We've had three experts to testify to that and opine the electric and the construction work and the floors were of poor workmanship quality, and they outline several defects. We've looked at them on the list. I've made notes about them; several defects and/or code violations that would be sufficient to constitute a breach of the contract and breach of Mr. Hopper's duty to construct these improvements in a workmanlike manner.
>
> Now, it does not amount to active or intentional fraud, but it does under the legal definition amount to constructive fraud; therefore, Mr. Hopper could only recover under Quantum Meruit. That would be the actual amount of labor and materials that he put out on the job and that he could prove. Those figures have been stipulated to be $12,255.04, so he would have been entitled to recover that amount. The constructive fraud basically destroys his contract, whether it's oral or written, so he's limited to recover under Quantum Meruit. So his complaint that he has filed seeking additional recovery is denied.
>
> Now, getting down to the figures, I've looked at this awning and gutter matter, and I've looked at the photographs; and it would appear to the Court that the awning and gutters would not have been necessary, had the building been sitting flush with the concrete pad. Not sitting flush causes water to drip off and hit the concrete pad; therefore allowing it to seep back into the room. I had considered whether or not to allow that, and I am going to allow it.
>
> Now, basically what I find, that Mrs. Moling contracted for a $19,800 addition to her house. She got it, but she had to pay $28,770.68 to get that. She paid $13,770 plus she paid $15,000 to Mr. Moling. So the difference there is $8,970 that she paid more than what she contracted for to get what she's actually got. She actually overpaid Mr. Moling [sic] because she paid him $2,745 more than he could recover under Quantum Meruit; therefore there would be a judgment in favor of Mrs. Moling for $11,715. The costs will be against Mr. Hopper.
>
> The tile claim that Mrs. Moling filed, the Court is not convinced by a preponderance of the evidence that it's totally chargeable to Mr. Hopper. It's very far removed. It's totally been fixed recently. There's been conflicting testimony about it, and I

resolve that in favor of Mr. Hopper. For one reason, the length of time involved.

The attorney's fees will be awarded to Mrs. Moling, and I have not set an amount there at this time because I don't know the figures. And, Mr. McWherter, if you submit me the application, submit that to Mr. Carter at the same time. Mr. Carter, if you want to oppose that or object to it say something about it, feel free to do that. I'll hold that about 15 days before I do anything. . . .

Thereafter, Counsel for Ms. Moling submitted her application seeking attorney's fees and discretionary costs in the amount of $11,355.73.

On March 29, 2004, the chancellor entered "Findings of Fact and Conclusions of Law" which consisted of an adoption of the transcript of the chancellor's oral ruling at the conclusion of the hearing. That same day, the chancellor entered an order dissolving the lien placed on Ms. Moling's real property by Mr. Hopper. On April 26, 2004, the chancellor entered a "Final Decree and Judgment" awarding Ms. Moling $11,715.00 in damages, attorney's fees in the amount of $9,244.12 pursuant to the Tennessee Consumer Protection Act, and discretionary costs in the amount of $876.11 pursuant to Rule 55.04(2) of the Tennessee Rules of Civil Procedure. Thus, Ms. Moling received a total judgment in the amount of $21,835.23 from the trial court. On May 25, 2004, Mr. Hopper filed a motion to alter or amend the judgment arguing that the evidence presented at trial did not support the trial court's findings and judgment. On September 1, 2004, the chancellor entered an order denying Mr. Hopper's motion.

## II.
### ISSUES PRESENTED

Mr. Hopper filed a timely notice of appeal to this Court presenting the following issues for our review:

1. Whether the chancery court erred in ruling that Appellant's failure to complete the requested work in a workmanlike manner amounted to constructive fraud which "destroyed" the contract between the parties;
2. Whether the chancery court erred in denying the Appellant the value of his personal labor in quantum meruit;
3. Whether the chancery court erred in its calculation of Appellee's damages, specifically:
   a. Whether the chancery court erred in its calculation of damages by including the cost of the awning in the damage award;
   b. Whether the chancery court erred by failing to deduct the expenses claimed by Appellee related to replacing the vinyl flooring;
   c. Whether the chancery court erred in its calculation of damages by including the cost of replacing the roof and carpet in the damage award; and

4.	Whether the chancery court erred in finding that Appellant should pay Appellee her attorney's fees.

Ms. Moling has presented the following additional issues for our review:

5.	Whether the chancery court erred in its calculation of damages by considering the amount of the contract between the parties when the trial court previously found that the contract to be void; and
6.	Whether the trial court erred in excluding Appellee's expenditures associated with the repair and/or replacement of the vinyl flooring installed by Appellant.

For the following reasons, we affirm in part and vacate in part the decision of the chancery court.

## III.
### STANDARD OF REVIEW

In a non-jury case, we evaluate the trial court's findings of fact *de novo* and afford those findings a presumption of correctness unless the preponderance of the evidence is otherwise. *See Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing Tenn. R. App. P. 13(d)); *Sloan v. Perryman*, No. M1999-00828-COA-R3-CV, 2000 Tenn. App. LEXIS 596, at *7 (Tenn. Ct. App. Aug. 31, 2000). In evaluating the trial court's findings of fact in this case, we are mindful of the following:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics. Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We review a trial court's conclusions of law under a purely *de novo* standard of review affording no presumption of correctness to those findings. *See Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); *Adams v. Dean Roofing Co., Inc.*, 715 S.W.2d 341, 343 (Tenn. Ct. App. 1986).

# IV.
## DISCUSSION

### A.
### *Constructive Fraud*

In her counter-complaint, Ms. Moling alleged that Mr. Hopper's conduct amounted to fraud. The trial court in the instant case relied upon the testimony of Ms. Moling's three experts, Mr. Woodard, Mr. Owens, and Mr. Stephenson, to conclude that Mr. Hopper breached the party's contract by failing to perform the projects in a workmanlike manner. The trial court went further and concluded that Mr. Hopper's actions amounted to constructive fraud, therefore, the contract was void. On appeal, Mr. Hopper argues that the evidence in the record fails to support a finding of constructive fraud.

"The doctrine of constructive fraud is recognized in this state as being a principle of equity." ***Land Developers, Inc. v. Maxwell***, 537 S.W.2d 904, 918 (Tenn. 1976) (citation omitted). This Court has previously adopted the following general explanation of the doctrine of constructive fraud:

> "Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidences or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. The presence or absence of such an intent distinguishes actual fraud from constructive fraud." 26 C.J. 1061; *Bank of Blount County v. Dunn*, 10 Tenn. App. 95; *Noel & Co. v. Henderson*, supra.

***Hartnett v. Doyle***, 64 S.W.2d 227, 232 (Tenn. Ct. App. 1932); *see also **Edwards v. Travelers Ins. of Hartford***, 563 F.2d 105, 114 (6th Cir 1977); ***Groover v. Torkell***, 645 S.W.2d 403, 409 (Tenn. Ct. App. 1982); ***Parks v. Alexander***, 608 S.W.2d 881, 891 (Tenn. Ct. App. 1980); ***Maxwell v. Land Developers, Inc.***, 485 S.W.2d 869, 874–75 (Tenn. Ct. App. 1972). The existence of fraud voids, *ab initio*, the contract into which it enters at the election of the defrauded party. *See **Hunt v. Walker***, 483 S.W.2d 732, 735 (Tenn. 1971); ***Brandon v. Wright***, 838 S.W.2d 532, 534 (Tenn. Ct. App. 1992).

As Mr. Hopper correctly points out, the doctrine of constructive fraud is commonly employed where there has been an abuse of a fiduciary or confidential relationship between the parties to the contract. *See **Land Developers, Inc.***, 537 S.W.2d at 918. However, constructive fraud may also be found to exist when a party's acts, statements, or omissions would be prejudicial to the public welfare, *see **Mawxell***, 485 S.W.2d at 874, such as contracts entered into in violation of law or against public policy. *See* Henry R. Gibson, *Gibson's Suits in Chancery* § 388 (William H. Inman

ed., 6th ed. 1982). The legislature has expressly provided that it is unlawful for a person to engage in general contracting or home improvement contracting without a license. Regarding "general contractors," the legislature has provided that "[i]t is unlawful for any person . . . to engage in or offer to engage in contracting in this state, unless such person . . . has been duly licensed under the provisions of this chapter, as hereinafter provided." Tenn. Code Ann. § 62-6-103(a)(1) (2003). The legislature has also provided that it is unlawful "for any person . . . to represent itself as a licensed contractor." Tenn. Code Ann. § 62-6-136(a) (2003). Failure to obtain a general contractor's license in violation of these provisions constitutes a Class A misdemeanor. Tenn. Cod Ann. § 62-6-120(a)(1) (2003). Regarding "home improvement contractors," the legislature has provided that "[n]o person shall maintain, own, operate or transact a home improvement business unless a license is first obtained as hereinafter provided." Tenn. Code Ann. § 62-37-104(b)(1) (2003). Failure to obtain a home improvement contractor's license in violation of these provisions constitutes a Class A misdemeanor. Tenn. Code Ann. § 62-37-114 (2003). Our supreme court has recognized that the legislature enacted the contractor's licensing statutes to protect the safety and property of the public, *see Kyle v. Williams*, 98 S.W.3d 661, 666 (Tenn. 2003), a policy which we can only conclude carries over into the statutes governing home improvement contractors as well.

After reviewing the record, we conclude that the evidence presented at trial supports the chancery court's finding that Mr. Hopper's conduct amounted to constructive fraud. At trial, Mr. Hopper admitted that he held himself out to Ms. Moling as a person qualified and competent to perform the work she requested. In fact, Mr. Hopper did not possess a contractor's license, electrician's license, or plumber's license. Ms. Moling also believed that Mr. Hopper, as a qualified professional, would secure the proper permits necessary for the job. Mr. Hopper testified that he began constructing the garage/bathroom addition without securing the necessary permit. While he did subsequently secure the necessary permit, he only secured a permit for $4,000.00 when the work to be performed was priced at $19,800.00. *See Zimmerman v. Ross*, No. 01A01-9201-PB-00036, 1992 Tenn. App. LEXIS 750, at *30–31 (Tenn. Ct. App. Sept. 2, 1992) ("[I]n this state the law is clear that omissions can constitute constructive fraud."). Accordingly, we affirm the trial court's finding that Mr. Hopper's conduct constituted constructive fraud which voided the contract at issue.

### *B.*
### *Appellant's Quantum Meruit Recovery*

After determining that the contract between the parties was void due to Mr. Hopper's constructive fraud, the trial court determined that Mr. Hopper could only recover the cost of his labor and materials (the $12,255.04 he stipulated to prior to trial) under a theory of quantum meruit. The stipulation entered into prior to trial sets forth payments made by Mr. Hopper to various entities and individuals for labor and materials, but it does not include an amount representing the labor he personally expended on the project. Mr. Hopper asserts that he is allowed to recover the cost of his personal labor expended on the project at issue under a quantum meruit theory as well. Mr. Hopper included a request for his personal labor in his motion to alter or amend the judgment, which the chancery court denied. On appeal, Mr. Hopper urges this Court to award him an amount for his personal labor by using a formula set forth in his brief to arrive at an award of $14,850.00. Ms.

Moling asserts that Mr. Hopper has waived this issue since he did not present any proof of the value of his personal labor at trial.

The legislature has promulgated statutes governing the licensing of "general contractors" and "home improvement contractors." "Home improvement" is defined by the legislature as follows:

> "Home improvement" means the repair, replacement, remodeling, alteration, conversion, modernization, improvement, or addition to any land or building, or that portion thereof which is used or designed to be used as a residence or dwelling unit for one (1), two (2), three (3), or four (4) dwelling units, and *includes the construction*, replacement, *or improvement* of driveways, swimming pools, porches, *garages*, landscaping, fences, fall-out shelters, roofing, painting and other improvements to structures or upon land which is adjacent to a dwelling house for one (1), two (2), three (3), or four (4) dwelling units. Without regard to the extent of affixation, "home improvement" includes the installation of central heating or air-conditioning systems, storm windows or awnings[.]

Tenn. Code Ann. § 62-37-103(6)(A) (2003) (emphasis added). "No person shall maintain, own, operate or transact a home improvement business unless a license is first obtained . . . ." Tenn. Code Ann. § 62-37-104(b)(1) (2003). Although the trial court did not discuss the statutes governing home improvement contractors and general contractors in its order, our independent review of the statutes and case law leads us to conclude that Mr. Hopper was acting as an unlicensed home improvement contractor during the events which gave rise to the instant litigation.[1] *See Varnadoe v. McGhee*, No. W2001-00075-COA-R3-CV, 2001 Tenn. App. LEXIS 949, at *10–15 (Tenn. Ct. App. Dec. 27, 2001) (discussing the differences between the statutes governing general contractors and home improvement contractors before ruling that an individual who agreed to complete a framing project for the homeowners was performing work as an unlicensed home improvement contractor).

In *Varnadoe*, we noted that, while the legislation governing general contractors contains a provision permitting the general contractor to "recover actual documented expenses only upon a showing of clear and convincing proof," Tenn. Code Ann. § 62-6-103(b) (2003), the statutes governing home improvement contractors does not contain a similar provision. *See id.* at *15. This Court concluded, however, that the statutory schemes governing these two categories of contractors were sufficiently analogous to permit a home improvement contractor "to recover under quantum

---

[1] At oral argument, counsel for Mr. Hopper asserted that Mr. Hopper was not required to obtain a license prior to engaging in the work at issue. However, the legislature has expressly enumerated those instances when a home improvement contractor's license is not required. *See* Tenn. Code Ann. § 62-37-107 (2003). Mr. Hopper fails to qualify for any of the enumerated exceptions.

-10-

meruit[2] limited to the actual documented expenses expended on the [project] as *shown by clear and convincing proof*."[3]  ***Id***. at \*18 (emphasis added).

Mr. Hopper failed to clearly and convincingly prove the value of his personal labor at trial. Upon reviewing the record, we find no evidence offered by Mr. Hopper which would tend to prove the value of his personal labor.  This Court has previously addressed the issue presented by Mr. Hopper in a similar case where we stated:

> The burden was upon [the Plaintiff] to prove in the trial court his entitlement to a judgment for services rendered on the basis of quantum meruit.  By his own admission, he failed to do so in the trial court.  "Without proof of damages, there can be no award of damages." *Inman v. Union Planters National Bank*, 634 S.W.2d 270, 272 (Tenn. App. 1982).
>
> There is no proof in this record as to the value of [the Plaintiff's] services. [The Plaintiff] has had his day in court with the

---

[2] "A party who had a contract at one time may pursue a quantum meruit recovery if the contract is no longer enforceable." ***Castelli v. Lien***, 910 S.W.2d 420, 428 (Tenn. 1995). "Liability under quantum meruit is based on a legally implied promise to pay a reasonable amount for goods or services received.  Thus, quantum meruit recoveries are limited to the actual value of the goods or services, not their contract price." ***Id***. at 427–28 (citations omitted).  Our supreme court has set forth the circumstances which warrant a quantum meruit action:

> A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:
>
> (1) There is no existing, enforceable contract between the parties covering the same subject matter;
> (2) The party seeking recovery proves that it provided valuable goods or services;
> (3) The party to be charged received the goods or services;
> (4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
> (5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

***Doe v. HCA Health Services of Tenn., Inc.***, 46 S.W.3d 191, 197–98 (Tenn. 2001) (quoting ***Swafford v. Harris***, 967 S.W.2d 319, 324 (Tenn. 1998)).

[3] The trial court apparently reached its decision that Mr. Hopper was entitled to a recovery under quantum meruit by finding that his conduct constituted constructive fraud, which, as previously noted, made the contract void at Ms. Moling's election.  However, as our case law interpreting the statutes governing the regulation of home improvement contractors indicates, Mr. Hopper would be entitled to recover the amounts he expended on the project under quantum meruit despite the trial court's finding of constructive fraud in this case.

> opportunity to prove the value of his services. Through no fault
> except his own, he failed to do so. He is not entitled to a second day
> to remedy his failure. This issue is without merit.

**Bokor v. Holder**, 722 S.W.2d 676, 680–81 (Tenn. Ct. App. 1986). Accordingly, we find that the chancery court did not commit error by denying Mr. Hopper the cost of his personal labor.

## C.
### Appellee's Damages

Turning to Ms. Moling's counterclaim for breach of contract, the trial court concluded that Mr. Hopper breached the contract by failing to perform the project in a workmanlike manner. The trial court denied Ms. Moling's claim for the cost of repairing the vinyl flooring installed by Mr. Hopper (which was installed in December of 1998) because she did not repair the floor until just prior to trial (which occurred in March of 2004). The chancery court arrived at the damage award in favor of Ms. Moling as follows:

- Ms. Moling contracted to have a garage/bathroom addition constructed onto her existing home for $19,800.00. She had to pay $28,770.68 for that addition ($13,546.54 in stipulated repair/completion costs prior to trial plus $224.14 for replacing the carpet in her home, for a total sum of $13,770.68; the chancellor then added this amount to the $15,000.00 she already paid to Mr. Hopper to arrive at the $28,770.68 total cost).
- The difference between what she actually paid ($28,770.68) and the agreed upon price ($19,800) is $8,970.68 (which the chancellor rounded down to $8,970.00).
- Next, the chancellor concluded that Ms. Moling paid Mr. Hopper $2,745.00 (the difference between the $15,000.00 Ms. Moling paid for the garage/bathroom addition and the $12,255.04 Mr. Hopper was entitled to for his labor and materials) above what he could obtain in quantum meruit.
- Therefore, the chancellor awarded Ms. Moling a judgment in the amount of $11,715.00 (the $8,970.00 she overpaid for the project plus the $2,745.00 above what Mr. Hopper could obtain in quantum meruit).

Both Mr. Hopper and Ms. Moling raise issues concerning the correctness of the chancellor's calculation of the damages in this case.

Since the parties present issues concerning the propriety of the trial court's damage award, we are cognizant of the following:

> Determinations concerning the amount of damages are factually
> driven. *See Loftis v. Finch*, 491 S.W.2d 370, 377 (Tenn. Ct. App.
> 1972). Thus, the amount of damages to be awarded in a particular
> case is essentially a fact question. *See Sholodge Franchise Sys., Inc.*
> *v. McKibbon Bros., Inc.*, 919 S.W.2d 36, 42 (Tenn. Ct. App. 1995);

> *Buice v. Scruggs Equip. Co.*, 37 Tenn. App. 556, 571, 267 S.W.2d
> 119, 125 (1953). However, the choice of the proper measure of
> damages is a question of law to be decided by the court. *See*
> *American Trust Inv. Co. v. Nashville Abstract Co.*, 39 S.W. 877, 881
> (Tenn. Chan. App. 1896); *see also Business Men's Assurance Co. v.*
> *Graham*, 891 S.W.2d 438, 449 (Mo. Ct. App. 1994); *Town of Fifield*
> *v. State Farm Mut. Auto. Ins. Co.*, 119 Wis. 2d 220, 349 N.W.2d 684,
> 686 (Wis. 1984).

*Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998); *see also Johnson v. Welch*, No.
M2002-00790-COA-R3-CV, 2004 Tenn. App. LEXIS 86, at \*26–27 (Tenn. Ct. App. Feb. 9, 2004).

"The purpose of assessing damages in a breach of contract suit is to place the [non-breaching party], as nearly as possible, in the same position he would have had if the contract had been performed." *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990) (citing *Action Ads, Inc. v. William B. Tanner Co., Inc.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979)). The chancery court's order does not expressly set forth the measure of damages it applied in this case. In evaluating the correctness of the chancery court's award of damages to Ms. Moling, we are guided by the following:

> As a general rule, the measure of damages for defects and
> omissions in the performance of a construction contract is the
> reasonable cost of the required repairs. *Estate of Jessee v. White*, 633
> S.W.2d 767 (Tuneup. 1982). This is especially true when the
> structure involved is the owner's home. *Edenfield v. Woodlawn*
> *Manor, Inc.*, 62 Tuneup. 280, 462 S.W.2d 237 (1970). However, in
> the event that the cost of repairs is disproportionate when compared
> with the difference in value of the structure actually constructed and
> the one contracted for, the diminution value may be used instead as
> the measure of damages. *Redbud Cooperative Corporation v.*
> *Clayton*, 700 S.W.2d 551 (Tuneup. 1985). However, this rule is
> applicable only when proof has been offered on both factors. The
> defendant argues that plaintiffs were required to offer proof of both
> factors so that the jury would be allowed to choose. We hold that the
> plaintiffs do not have the burden of offering alternative measures of
> damages. The burden is on the defendant to show that the cost of
> repairs is unreasonable when compared to the diminution in value due
> to the defects and omissions . . . .

*Nutzell v. Godwin*, No. 33, 1989 Tenn. App. LEXIS 485, at \*2–3 (Tenn. Ct. App. July 13, 1989).
Ms. Moling sought to recover her costs associated with completing and repairing the structure begun
by Mr. Hopper, and we find nothing in the record to indicate that Mr. Hopper sought to demonstrate
that the diminution in value measure should be applied instead of the cost of repair measure of

damages. *See GSB Contractors, Inc. v. Hess*, No. W2003-03068-COA-R3-CV, 2005 Tenn. App. LEXIS 225, at \*9–18 (Tenn. Ct. App. Apr. 15, 2005), *perm. app. pending*,(discussing the effect of a defendant's failure to offer proof that the cost of repair is the incorrect measure of damages in a construction contract case). In fact, Mr. Hopper concedes in his brief that the cost of repairing the defective structure is the appropriate measure of damages in this case. Accordingly, we conclude that the proper measure of damages for Mr. Hopper's breach of the construction contract at issue in this case is Ms. Moling's cost in repairing and/or completing the defective work.

Both parties contest the trial court's treatment of the amount Ms. Moling expended on replacing the vinyl flooring installed by Mr. Hopper. Mr. Hopper contends that the trial court, after finding that Ms. Moling failed to prove her claim regarding the defective tile, improperly included the cost of replacing the tile in the damages award. Conversely, Ms. Moling contends that the trial court awarded her all of her costs associated with repairing the defective work performed by Mr. Hopper except the cost of replacing the vinyl floor. Strangely, Ms. Moling concedes that "the repair costs for the vinyl floor should not have been included in the judgment."

"[I]n an action for a breach of contract the injured party is bound to use all proper means and efforts to protect himself from loss and can charge the other party only for such damages as by reasonable endeavors on his part he could not prevent." *Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979). The chancery court noted the conflicting testimony surrounding the vinyl flooring claim, and resolved the conflict in favor of Mr. Hopper. We give such credibility determinations great weight on appeal. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."). Accordingly, we affirm the chancery court's ruling that Ms. Moling is not entitled to recover her costs associated with replacing the vinyl flooring.

This does not conclude our inquiry of this issue, however, because the trial court clearly included the costs associated with repairing the vinyl flooring in its damages calculation. The stipulation entered into between the parties prior to trial stated that Ms. Moling expended $13,546.54 in repairing Mr. Hopper's defective work. This amount included the $3,187.00 she expended replacing the vinyl flooring. Thus, the chancellor erred to the extent that the chancellor's calculation of Ms. Moling's damages included the cost of repairing the vinyl flooring.

Next, Mr. Hopper notes that the party's original contract did not include the cost of an awning or patio in the original contract price. As far as we are able to glean from his arguments on appeal, Mr. Hopper is arguing that awarding the cost of installing the awning and patio would constitute unjust enrichment to Ms. Moling. In turn, Ms. Moling asserts that these costs were necessary to remedy the leaks which resulted from Mr. Hopper's defective work. Regarding the repairs to the roof, Mr. Hopper argues that a picture introduced at trial shows that the shingles Ms. Moling had installed to repair the leak are the same as those on the rest of the house. Thus, Mr. Hopper contends that Ms. Moling took the opportunity to replace her entire roof and included this cost in her request for damages. We find this contention to be without merit since the record is

devoid of any evidence supporting this allegation. As for the cost of replacing the carpet, Mr. Hopper contends that Ms. Moling's undue delay in having the roof repaired resulted in the damage to the carpet.

Each of the arguments made by Mr. Hopper on appeal constitutes an attack on the amount of damages, not the appropriate measure of damages. As previously noted, the determination of the amount of damages is a fact question. ***Beaty v. McGraw***, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998). Our review of the record does not reveal any evidence which would tend to preponderate against the trial court's findings of fact regarding these issues. Accordingly, we affirm the trial court's inclusion of the costs for installing the awning and patio, repairing the roof, and replacing the damaged carpet in the damage award.

Finally, Ms. Moling argues that the trial court erred by considering the contract price when it held that the contract was void due to Mr. Hopper's constructive fraud. We agree. As previously noted, the proper measure of damages in this case is the cost Ms. Moling expended on repairing the defective work performed by Mr. Hopper. ***See Nutzell v. Godwin***, No. 33, 1989 Tenn. App. LEXIS 485, at *2–3 (Tenn. Ct. App. July 13, 1989). Although the trial court's order is not exactly clear, it appears as though the trial court attempted to use the contract price and the cost of repair to calculate Ms. Moling's damages in this case.

Due to the errors in the trial court's calculation of damages to Ms. Moling, we vacate the trial court's order in so far as the calculation of damages awarded to Ms. Moling. Instead, we hold that Ms. Moling is entitled to the following damages:

- Mr. Hopper is entitled to recover the cost of the labor and materials as proven at trial (i.e., the $12,255.04 he stipulated to prior to trial) under the theory of quantum meruit. Ms. Moling paid Mr. Hopper $15,000.00 for the garage/bathroom addition, therefore, she is entitled to recover from Mr. Hopper $2,744.96, representing the amount she paid in excess of his labor and materials, to prevent his unjust enrichment.
- The parties stipulated that Ms. Moling expended $13,546.54 to repair and/or complete the work performed by Mr. Hopper. From this amount, $3,187.00 is to be deducted for the cost of replacing the vinyl flooring. Thus, Ms. Moling is entitled to $10,359.54 which represents her costs for repairing the defective work performed by Mr. Hopper. Ms. Moling is also entitled to $224.14 representing the cost of replacing the carpet in her home. In sum, Ms. Moling is entitled to $10,583.68 in damages.

Accordingly, Ms. Moling is entitled to a judgment in the amount of $13,328.64 (the $2,744.96 overpaid to Mr. Hopper plus the $10,583.68 she incurred in repairing and/or completing the defective work performed by Mr. Hopper).

### D.
### *Attorney's Fees*

In its "Final Judgment and Decree," the chancery court awarded Ms. Moling $9,244.12 in attorney's fees "*as authorized* by the Tennessee Consumer Protection Act." (emphasis added). In the final issue presented for our review, Mr. Hopper argues that the chancery court erred in awarding such fees because "[a] statutory basis, contractual obligation or other equitable ground must exist for a court to order the losing party to pay the prevailing party's attorney's fees." During oral argument, counsel for Mr. Hopper argued that the chancery court's order did not contain an express finding that a violation of the Tennessee Consumer Protection Act occurred in this case.

Tennessee adheres to the firmly established "American Rule" which requires litigants to pay their own attorney's fees absent a statutory or contractual provision providing otherwise. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000). The Tennessee Consumer Protection Act provides that, "[u]pon *a finding by the court that a provision of this part has been violated*, the court may award to the person bringing such action reasonable attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(1) (2003) (emphasis added). When evaluating a trial court's grant of attorney's fees under the statute, we employ the following standard of review:

> Because the Act gives the trial court the discretion to award or to deny attorney fees in the circumstances enumerated, we review a trial court's decision regarding fees under the abuse of discretion standard. A finding of abuse of discretion is proper when the trial court applied an incorrect legal standard or reached a decision against logic or reasoning that caused an injustice to the party complaining. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *State v. Coley*, 32 S.W.3d 831, 833 (Tenn. 2000).

*Glanton v. Bob Parks Realty*, No. M2003-01144-COA-R3-CV, 2005 Tenn. App. LEXIS 263, at \*29 (Tenn. Ct. App. Apr. 27, 2005). While the Tennessee Consumer Protection Act may *authorize* an award of attorney's fees, such an award is premised on a trial court *finding a violation of the Act*. In this case, the trial court found that Mr. Hopper was guilty of constructive fraud. Although the trial court did not expressly state that Mr. Hopper's conduct was a violation of the Tennessee Consumer Protection Act, it found as a fact that Mr. Hopper was guilty of conduct which constituted such a violation. *See* Tenn. Code Ann. § 47-18-104(b)(27), (33) (2003). In awarding attorney's fees, the trial court relied upon the Act and made specific reference to it. We believe this is sufficient under the facts of this case to establish a finding by the trial court that there was a violation of the Act. *But cf. Hall v. Hamblen*, No. M2002-00562-COA-R3-CV, 2004 Tenn. App. LEXIS 524, at \*7–8 (Tenn. Ct. App. Aug. 16, 2004) ("Simply mentioning the Tennessee Consumer Protection Act as a basis for fees does not qualify as a finding of a violation of it."). Therefore, we affirm the award of attorney's fees to the Appellee.

## V.
### CONCLUSION

For the aforementioned reasons, we affirm the chancery court's finding that Appellant's conduct amounted to constructive fraud which voided the contract between the parties, and we affirm the chancery court's finding that Appellant was not entitled to the cost of his personal labor under quantum meruit. After reviewing the chancery court's findings regarding Appellee's damages, we affirm the chancery court's decision to exclude the cost of replacing the vinyl flooring, include the cost of the awning, include the cost of repairing the roof, and include the cost of replacing the carpet. However, we find that the chancery court erred in its calculation of the damages to be awarded to the Appellee, and we vacate that portion of the chancellor's order setting forth said calculation. In turn, we enter judgment in favor of Appellee in the amount of $13,328.64, as set forth *supra*. Finally, we affirm the trial court's award of attorney's fees to Appellee in the amount of $9,244.12. Costs of this appeal are to be taxed to the Appellant, Donald G. Hopper and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE